

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS

## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable O. P. Lockhart, Chairman
Board of Insurance Commissioners
Austin, Texas

Dear Sir:

Opinion No. O-4092
Re: Do the facts outlined disclose
any violation of the laws or
any ultra vires act or acts on
the part of all or any of the
three corporations in question?
(National Hospitalization Sys-
tem, Inc., St. Paul's Hospital,
and Dallas Methodist Hospital)

Your letter requesting an opinion of this department
regarding the above stated question reads as follows:

"As a predicate for the opinion hereinafter
requested, we state the following facts:

"National Hospitalization System, Inc.,
(hereinafter called 'System') is a Dela-
ware corporation incorporated October 20,
1930 under Chapter 65 of the Revised
Code of Delaware with 6,000 shares of
non par value common stock to be sold for
$15,000 and 500 shares of non par value
preferred stock to be sold for $25,000;
3,608½ shares of the common stock being
subscribed and actually paid for at $2.47
per share, $8,943; and 62½ shares of the
preferred stock being subscribed and fully
paid for a total of $3,125.00. The System,
on September 3, 1932, was granted by our
Secretary of State Texas Permit No. 7637,
expiring ten years from that date, wherein
it is authorized in Texas 'to act as agents
for hospitals in securing members who
desire hospitalization, and to transact all

Honorable O. P. Lockhart, Page 2

business incident thereto, together with
such other rights and privileges as are
conferred on foreign corporations by the
laws of Texas, subject to compliance with
the Constitution and laws thereof.' Its
application for permit states, and it is
a fact, that its principal office in Texas
is in the Praetorian Building in Dallas,
Texas; and the application recites also
(which is a fact so far as we are advis-
ed) that it is at present transacting
business in Texas only. The application
recites 'Its business in the State of
Texas is to be transacted throughout the
State'. Attached to its application is
certified copy of its original articles
of incorporation showing that its prin-
cipal office is in Dover, Kent County,
Delaware; that its resident agent in that
state is the United States Corporation
Company, whose address is 19-21 Dover
Green, Dover, Delaware. This is a typi-
cal Delaware charter, wherein it is au-
thorized not only 'to act as representa-
tives for hospitals in securing employees
who desire hospital service and to trans-
act all business incidental thereto', but
it is also specifically authorized to do
many other things not embraced in its
Texas permit - in fact, nearly anything
and everything throughout the chromatic
scale of human and corporate activity.

"Its Texas activities consist princi-
pally or exclusively of serving as agent
(or in whatever other capacity the facts
hereinafter recited show) in the promotion
and operation of a hospitalization service
plan for or in cooperation with St. Paul's
Hospital and Dallas Methodist Hospital,
both of Dallas, Texas. Records in the
Secretary of State's office show that each
of these hospitals is incorporated under
the laws of Texas as charitable and bene-
volent corporations with the power of

acquiring, erecting, owning, and operating upon a charitable basis a hospital or sanatorium in the city of Dallas, with a training school for nurses in connection therewith; St. Paul's Hospital being owned and operated by a Catholic order known as the Sisters of Charity, with its 'Central House' at Normandy, Missouri, and providing that 'the corporation shall have no capital stock'; that 'members of this corporation are Sisters of Charity . . . no person can be at any time a member of this corporation or have any interest in it unless she be a Sister of Charity of the same Society; and should any member of this corporation cease at any time to be a Sister of Charity she shall also cease to be a member of this corporation, and forfeit all claim she may have on account of her membership in the corporation. No formal act of resignation shall be necessary on the part of a retired or retiring member. Removal by death or by the Superiors at Normandy, Missouri, shall be sufficient. The interest of a member shall be unassignable and shall not pass to anyone other than the members of the corporation, by bequest, devise, descent, or voluntary or involuntary conveyance'; and the Dallas Methodist Hospital likewise has a charter providing that 'said corporation is formed for benevolent and charitable purposes. It shall have no capital stock . . . it shall never pay dividends or profits to anyone, but all funds deriving from the conduct of its business shall be used to pay expenses and for repairs and extensions . . . this charter is taken out in conformity with resolutions adopted by the North Texas Annual Conference of the Methodist Episcopal Church South, in session on October 29, 1920, and the affairs of same shall be directed by thirteen trustees and shall be under the control and ownership of the above named North Texas Annual Conference

and such other annual Conferences of
such Methodist Episcopal Church South
as may hereafter be permitted to par-
ticipate by said North Texas Annual
Conference, and said North Texas Annual
Conference and other Conferences par-
ticipating shall have the absolute
right to confirm each and all the
trustees hereinafter named, and their
successors in trust. No trustee here-
after appointed shall have the right
to hold office if confirmation shall
be refused by said North Texas Annual
Conference or Conferences participat-
ing'.

"The plan under which the hospital
system mentioned above is operated is
substantially as follows: National
Hospitalization System, Inc., pre-
sumably advertises its services; it
has several solicitors who contact
prospects individually throughout the
State and secure applications which
are submitted at its office; if the
Management of the System is convinced
that the risk would be acceptable to
the hospital, the application is then
by it forwarded to the Superintendent
of the hospital indicated on the appli-
cation together with a remittance
equivalent to 70% of the entire pre-
mium which is collected by the System's
representative for the first monthly,
quarterly, semi-annual, or annual
period, as desired by the applicant.
The other 30% of the gross premiums
(both initial and subsequent) being re-
tained by the System as its compensation
or profit in the enterprise. If the
Superintendent of the hospital approves
the applicant for membership, he signs
the form of policy or contract and re-
turns it to the System, which then de-
livers it to the applicant. There is
submitted with this letter a specimen

copy of the form of application and policy
certificate (or other contract) used in
the Dallas Methodist Hospital's end of
the business. The application and policy
or certificate used by St. Paul's Hospi-
tal are identical in form with the speci-
men copy submitted, except for substitu-
tion of the name of the hospital.

"The contracts between the System and
the two hospitals, respectively, each pro-
vide that it can be voided by the hospi-
tal on ten days notice if the hospital
discovers that any provisions of such
contract have been violated by the System,
in which event the hospital shall take
over and perform all functions formerly
performed by the System and enjoy all
benefits and privileges formerly enjoyed
by the System, and shall make all col-
lections thereafter from the members and
retain 100% of same as its own. The
System agrees to maintain a total member-
ship at each hospital of not less than
4,000 or more than 5,500, and if the mem-
bership falls below the minimum or exceeds
the maximum, it constitutes a violation
for which the hospital may take over as
above indicated. The System writes both
group and individual business. If a
group has as many as ten members, premiums
can be paid monthly; whereas individuals
may pay only on the quarterly, semi-annual,
or annual basis. The age limit is from
16 to 60 years, and the annual premium is
$9.00 per member for all ages.

"Neither of the hospitals has complied,
or made any attempt to comply, with any of
the provisions of Article 4590a or of
Title 78, nor has the National Hospitaliza-
tion System, Inc., and none of the three
corporations or any of their employees
has been licensed by this Department to
conduct an insurance business or the
business of an insurance agent.

"It is our opinion that each of the
hospitals, severally, and its employees,
is carrying on the business of group and

individual hospitalization insurance, in violation of the statutes of the State; and that the National Hospitalization System, Inc., is engaged in such hospitalization insurance business jointly with the respective hospitals in violation of such statutes, or that it and its employees and the employees of the hospitals are acting as insurance agents (local recording agents and/or solicitors) in violation of the terms of our statutes, which specifically forbid corporations from being licensed as insurance agents.

"We suggest that you consider what bearing, if any, the following statutory provisions, among others, have upon our questions: Articles 4590a, 4686, 4716, 5055, 5056, 5058, 5060, 5062a, 5062b, and 5068b.

"Aside from the question of whether these three corporations and their employees are unlawfully operating an insurance business or the business of insurance agents, it is our view also that each of the corporations is acting ultra vires, so as to justify appropriate quo warranto, injunction, or other proceedings against them.

"We are submitting herewith in support of our views a brief, which, while not exhaustive, may be helpful.

"Please advise us whether or not, in your opinion, the state of facts above outlined discloses any violation of our laws, either civil or criminal, or any ultra vires act on the part of all or any of the three corporations above named.

"If your answer is in the affirmative we request, pursuant to the statutes, that you institute such proceedings as may be justified, and this Department tenders to you its cooperation in every possible way in connection therewith."

The word "insurance" is defined in Corpus Juris, Vol. 32, p. 975, as follows:

"Broadly defined, insurance is a contract by which one party, for a compensation called the premium, assumes particular risks of the other party and promises to pay to him or his nominee a certain or ascertainable sum of money on a specified contingency. As regards property and liability insurance, it is a contract by which one party promises on a consideration to compensate or reimburse the other if he shall suffer loss from a specified cause, or to guarantee or indemnify or secure him against loss from that cause. With some exceptions, particularly in the case of life insurance, insurance is a contract of indemnity. The term insurance denotes also the act of insuring by the contract here defined, as well as the system of business of which such contracts are the characteristic and vital element."

Couch on Insurance, Vol. 1, sec. 2, p. 3, defines the word "insurance" as follows:

". . . Strictly defined, insurance, . . . is a contract whereby one for a consideration agrees to indemnify another for liability, damage, or loss by perils to which the subject insured may be exposed. In . . accident insurance it is the . . health of the person that is the subject of the contract. . . . It also has been said that 'the word "insurance" in common speech and with propriety is used quite as often in the sense of contract of insurance, or act of insuring, as in that expressing the abstract idea of indemnity or security against loss.'

". . . In this connection it should be remembered that the character of insurance is not to be determined by the character of the company writing it, the nomenclature used, or the manner or mode of affording insurance, but by the nature of the contract actually entered into or issued. In other words, the true character of an alleged contract of insurance

cannot be concealed or changed by the use
or absence of words, it being immaterial whe-
ther or not the contract on its face purports
to be one of insurance, since the court will
look behind the terminology to ascertain what
the parties intended to accomplish."

Article 4590a, Vernon's Annotated Civil Statutes,
authorized the organization and incorporation of non-profit
corporations for group hospital service. The act further
provides in part:

". . . That such corporations organized
and operated under the provisions of this
Act shall not be required by any department
of this State to post bond, or place deposits
with any department of this State to begin
and/or operate under this Act and the provi-
sions of Title 78 of the Revised Civil Stat-
utes of Texas of 1925, are hereby declared
inapplicable to corporations organized and/or
operated under this Act."

However, such corporations are subject to certain
supervision of the Insurance Department of this State. Under
the facts stated in your letter, none of the above mentioned
corporations are incorporated under Article 4590a, supra, or
are attempting to operate under such statute.

In Texas Jurisprudence, Vol. 24, p. 651, § 3, notes
2 and 3, it is said:

"It is elementary, also, that insurance,
other than that of life and accident where the
result is death, is a contract of indemnity;
and this, regardless of the fact that the sum
to be paid is agreed upon in advance." (Cit-
ing Southwest National Bank v. Employers In-
demnity Corp., 12 S. W. (2d) 189, 191; Fire
Association of Philadelphia v. Strayhorn, 211
S. W. 447; Delaware Insurance Co. v. Hill,
127 S. W. 283.)

You have furnished us with a copy of the application
and service contract used by the Methodist Hospital of Dallas,
Texas, and state in effect that the applications and service

contracts used by both of the above named hospitals are identical except as to the names of applicants, and of course, the name of the particular hospital making the service contract is set forth in said contract; otherwise, as above stated, the applications and service contracts are the same. The application and the service contract of the Methodist Hospital of Dallas, Texas, above mentioned, are as follows:

Application:

"I, the undersigned, do hereby make application for membership in the hospitalization plan of Methodist Hospital of Dallas, Texas, through the National Hospitalization System, Inc., the authorized agents and collectors of dues, payable in advance at the rate of: _ 75¢ Monthly _ $2.25 Quarterly & $4.50 Semi-Annually _ $9.00 Annually, the membership to become operative and in force immediately in case of accident, and after 10 days from date of contract in case of illness. Should I change my present employment my membership shall stay in full force so long as my dues are paid. Unemployed wives of husbands in groups are written on same basis as husbands, and are automatically cancelled when husband's contract lapses. Contract of member who becomes unemployed house-wife is automatically cancelled. Default in payment of dues for ten days automatically cancels the Service Contract I am to receive if accepted; if rejected, money paid on application will be refunded. I certify that I am in goodhealth and without chronic ailment of any kind. I understand and agree that I am not to receive hospitalization service for any existing disease, ailment or injury nor complications arising therefrom, nor for tuberculosis, intoxication, nervous disorders, insanity, venereal diseases, syphilis, suicidal cases, or for any quarantinable disease; nor for diseases of or surgical operations for miscarriage, abortion, or troubles arising from this source, nor for complications arising from previous deliveries; however, a discount of 50% will be allowed off the regular hospital charges for a period of twenty-one days for such ailments as hernia, hemorrhoids, diseases or operations on

uterus, tubes or ovaries after the contract has been in full force for one year and upon entering the second and following years.

Age \_\_\_\_\_ Date of last illness_____19\_\_\_\_ Nature _____

Attending physician _____ Reference _____
who can verify my statements. I fully understand that any false statements regarding my health will not entitle me to membership. This application becomes a part of the Service Contract and is the basis on which it is issued.

I authorize _____ to deduct my dues each month.

Employed by )
or wife of  ) _____

Name (print) _____ ) The undersigned has
                                            ) read and fully under-
                                            ) stands the contents
Res. Address _____ ) of this application
                                            ) and that any verbal
                                            ) promises or repre-
                                            ) sentations made by
                                            ) either party are here
                                            ) and now waived.
Bus. Phone _____ Res. Phone \_\_\_\_\_ ) Signed in duplicate.

                                            This \_\_\_\_ day of
Witness:                                    _____, 194\_\_\_

_____ (Signed) _____
    Representative                                        Applicant

Make all checks payable to National Hospitaliza-
tion System, Inc."

(On reverse side of application):

### Minor Dependent Children

Name _____
Age _____ Sex _____

Name _____
Age _____ Sex _____

Name _____
Age _____ Sex

"Remarks:

_____"

Service Contract:

"DALLAS METHODIST HOSPITAL

Number

Non-Transferable

"SERVICE CONTRACT

"The METHODIST HOSPITAL of Dallas, hereinafter designated as 'Hospital', agrees and contracts with

_____ from _____
hereinafter designated as 'Member' in consideration of payment of dues in advance to our duly authorized agents THE NATIONAL HOSPITALIZATION SYSTEM, INC., in installments as agreed upon when signing application, to give said Member the following Hospital Service, upon authorization of said Member's doctor, who must be a member of the Dallas County Medical Society. In case of emergency Member will be rendered first aid in the Emergency Department and will be cared for until the Member's doctor arrives.

"This Service Contract entitles Member to a private, or semi-private room (room not to exceed $5.00 per day), operating room, anesthetion, general nursing, nursing supervision, technicians, dietitians, meals, routine medicine, surgical supplies, routine laboratory work, and all other usual hospital service during a period of hospitalization not to exceed twenty-one hospital days during the contract year, however, after Member has used the twenty-one days allowed, in case further hospitalization is necessary, a 33 1/3% discount from regular prices will be given for an additional thirty days. This does NOT include doctors' fees, prescriptions written by Member's doctor or on his orders, nor the service of a special private nurse, nor x-rays, oxygen tents, physiotherapy, intravenous medicines, anti-toxins, vaccines, serums, nor special laboratory work.

"It is further agreed that in the event the member suffers an accident outside of Dallas

County, Texas, and it is necessary to have immediate hospitalization, the hospital agrees to reimburse the member to the extent of $5.00 per day upon receipt of written proof from the hospital where the member was confined; however, in no event does this clause cover more than the twenty-one (21) hospital days alloted the member during any one contract year.

"If all the private or semiprivate rooms of the Hospital are occupied at the time Member is entered as a patient, then Member agrees to be placed temporarily in a room of different class until such room is available. Member agrees to be moved at the option of the Hospital. If the Member is furnished a semiprivate (two or three beds) room, the terms of this contract are thereby satisfied. Member is subject to regular charges in the Hospital after his doctor has given an order for his discharge from the Hospital. For all charges made by the Hospital for service not covered by this contract the Member agrees to pay the Hospital cash upon demand and in no event later than upon leaving the Hospital. Failure to pay such charges upon or before leaving the Hospital automatically terminates this contract as of date of such default, and all dues theretofore paid hereunder shall be retained by the Hospital.

"Default in the payment of dues for a period of TEN DAYS automatically cancels this contract, without written notice to Member, and dues received after said ten days are subject to rejection by the Hospital for any reason. The acceptance by the Hospital of a past due installment shall not be considered a waiver of any of the conditions of this contract.

"No service shall be provided Member for any chronic disease, ailment or injury nor complications arising therefrom, nor for tuberculosis, intoxication, nervous disorders, insanity, venereal diseases, syphilis, suicidal cases, or any quarantinable disease; nor for

diseases of or surgical operations for miscarriage, abortion, or troubles arising from this source, nor for complications arising from previous deliveries; however, a discount of 50% will be allowed off the regular hospital charges for a period of twenty-one days for such ailments as hernia, hemorrhoids, diseases or operations on the uterus, tubes or ovaries after the contract has been in full force for one year and upon entering the second and following years.

"Maternity cases are not included in this contract, but a discount of 50% from the flat Hospital charges will be allowed Member in good standing after having retained membership for a period of a year. Maternity cases can only be hospitalized under this contract for a period of Seven Days. If a longer stay is desired, no discount is allowed, for either the mother or the baby.

"Only persons between the ages of sixteen and fifty-five are acceptable as members. This contract is subject to cancellation when the holder reaches the age of sixty years. Minor dependent children under sixteen years of age are entitled to a 50% discount from the regular Hospital charges, provided both parents are members in good standing and provided further that their names and ages are listed on the application of their parents.

"Any Member who makes false statements regarding his or her health or age at time of signing application will not be entitled to hospitalization under this contract. The application which Member signs is a part of, and is the basis for, issuance of this contract.

"In case of epidemic, public disaster or other conditions causing an overcrowding of the capacity of the Methodist Hospital of Dallas to such a degree that it is not possible to provide accommodations, in such event the Methodist Hospital of Dallas agrees to refund twice the amount of dues received from Member during the

Honorable O. P. Lockhart, Page 14

Twelve Months immediately preceding; and such refund shall fully discharge the responsibility of the Methodist Hospital of Dallas.

"This contract does not apply to industrial hazards coming under the supervision of the Industrial Accident Board. Member agrees to pay the balance of the yearly dues when admitted to the Hospital. It is required that Member leave this Contract at the Admitting Office while confined, Contract will be returned upon discharge.

"METHODIST HOSPITAL OF DALLAS

By _____

(SEAL)                                    Superintendent"

(On the reverse side of the contract):

"I, the undersigned, do hereby make application for membership in the hospitalization plan of Methodist Hospital of Dallas, Texas, through the National Hospitalization System, Inc., the authorized agents and collectors of dues, payable in advance at the rate of: 75¢ Monthly — $2.25 Quarterly — $4.50 Semi-Annually — $9.00 Annually, the membership to become operative and in force immediately in case of accident, and after 10 days from date of contract in case of illness. Should I change my present employment my membership shall stay in full force so long as my dues are paid. Unemployed wives of husbands in group are written on same basis as husbands, and are automatically cancelled when husband's contract lapses. Contract of member who becomes unemployed housewife is automatically cancelled. Default in payment of dues for ten days automatically cancels the Service Contract I am to receive if accepted; if rejected, money paid on application will be refunded. I certify that I am in good health and without chronic ailment of any kind. I understand and agree that I am not to receive hospitalization service for any existing disease, ailment or injury nor complications arising therefrom, nor for tuberculosis, intoxication, nervous disorders, insanity, venereal diseases, syphilis, suicidal cases, or any quarantinable disease; nor for

diseases of or surgical operations for mis-
carriage, abortion, or troubles arising from
this source, nor for complications arising
from previous deliveries; however, a discount
of 50% will be allowed off the regular hospi-
tal charges for a period of twenty-one days
for such ailments as hernia, hemorrhoids,
diseases or operations on the uterus, tubes
or ovaries after the contract has been in
full force for one year and upon entering
the second and following years:

Age _____ Date of last Illness _____ 194_ Nature _____

Attending physician _____ Reference _____
who can verify my statements. I fully understand
that any false statements regarding my health will
not entitle me to membership. This application
becomes a part of the Service Contract and is the
basis on which it is issued.

I authorize _____ To deduct my dues each
month.

Employed by      )
or wife of       ) _____
Witness:

                           Name (Print) _____
                           Res. Address _____
_____
        Representative

                           Bus. Phone _____ Res. Phone _____

The undersigned has read and fully understands
the contents of this application and that any verbal
promises or representations made by either party
are here and now waived. Signed in duplicate this
_____ day of _____, 194__.

                    (Signed) _____
                                      Applicant

Make all checks payable to
National Hospitalization System, Inc."

From the facts stated in your inquiry, and from the
application and service contract based thereon, it is apparent
that the essence of the above mentioned hospitalization scheme
is to indemnify, in part, the members against excessive cost
of hospitalization contingencies. As in the case of burial

Honorable O. P. Lockhart, Page 16

associations where the funeral benefits are contracted to
be furnished in kind and not paid in cash, the benefits
here are unconditionally contracted to be either furnished
in kind through hospital services and accommodations or,
in the alternative, in certain instances based upon con-
tingencies, the System and the Hospital agree that their
option to refund to the member in lieu of such services
a sum in cash equivalent to double the amount of dues paid
for the first 12 months period. In the service contract
of both hospitals, it is provided:

> ". . . that in the event the member
> suffers an accident outside of Dallas County,
> Texas, and it is necessary to have immediate
> hospitalization, the hospital agrees to re-
> imburse the member to the extent of $5.00 per
> day upon receipt of written proof from the
> hospital where the member was confined; how-
> ever, in no event does this clause cover more
> than the twenty-one (21) hospital days allot-
> ed the member during any one contract year."

We quote from 63 A. L. R. 713 as follows:

> "Whether or not an association or cor-
> poration is carrying on an insurance business
> must be determined by the particular objects
> which it has in view, and not by abstract de-
> clarations of a general purpose to do acts of
> charity, so that, although the charter of a
> corporation declares that its object is 'the
> general good, and not individual profit,' it
> may be declared to be an insurance company.
> And, of course, the name by which a company or
> association, or its certificates or policies,
> is designated is not determinative of the
> question whether the organization is an in-
> surance company or its contracts are in the
> nature of insurance policies. (Citing Southern
> Surety Company v. Austin, 17 S. W. (2d) 774).
> It is immaterial that the term 'insurance'
> nowhere appears in the contract. And the terms
> and mode of payment of the consideration are
> not determinative of the question whether the
> contract is one of insurance. It may be ob-
> served, also, that the question as to the

Honorable O. P. Lockhart, Page 17

nature of the insurance presented by an insurance contract is not to be settled by the nature and organization of the association, but rather by the terms and character of the contract itself."

The two above mentioned hospitals are incorporated as charitable and benevolent corporations, and are actually engaged in the insurance business and for profit. The facts stated in your letter further reflect that the Delaware corporation above mentioned is acting as agent for the hospitals.

We have carefully considered Title 78, Vernon's Annotated Civil Statutes, which contains the statutes relative to insurance in this State. Article 4716, Vernon's Annotated Civil Statutes, defines a health insurance company as follows:

"A health insurance company shall be deemed to be a corporation doing business under any charter involving the payment of any amount of money, or other thing of value, conditioned upon loss by reason of disability due to sickness or ill health."

An accident insurance company is defined by Article 4716 as follows:

"An accident insurance company shall be deemed to be a corporation doing business under any charter involving the payment of money or other thing of value, conditioned upon the injury, disablement or death of persons resulting from traveling or general accidents by land or water."

In view of the foregoing facts and statutes applicable thereto as set forth in Title 78, supra, it is our opinion that both of the above named hospitals are carrying on the business of health and/or accident insurance in contravention of the insurance laws of this State and that the above named Delaware corporation is unlawfully acting as their agent.

You further ask if there are any ultra vires act or acts on the part of all or any of the three corporations mentioned in your inquiry.

Honorable O. P. Lockhart, Page 18


It is stated in Texas Jurisprudence, Vol. 10, p. 894:

' "There is a plain distinction between cor-
porate acts which are invalid because they are
beyond the powers of the corporation and acts
which are illegal or contrary to public policy.
This appears in the legal consequences ensuing
from ultra vires and illegal transactions
respectively. It is convenient to keep this
distinction in mind by using the expression
'ultra vires' to designate only acts which are
in excess of the corporate powers and to denom-
inate as 'illegal' those acts which a corpora-
tion is forbidden to do. Strictly speaking,
'the term "ultra vires" is used to designate
the acts of corporations beyond the scope of
their powers as defined by their charters or
acts of incorporation.' . . ."

Cook on Corporations, Vol. 2, 6th Ed., p. 1991,
states:

"It rarely happens that the state objects
to an ultra vires act. That it has a right
to object by quo warranto is undoubted."

However, Article 4, Section 22 of the State Consti-
tution provides that the Attorney General shall especially
inquire into the charter rights of all private corporations,
and in the name of the State take such action in the courts
as may be proper to prevent any private corporations from exer-
cising any power or demanding or collecting any species of
taxes, tolls, freights or wharfage, not authorized by law,
and shall whenever sufficient cause exists, seek a judicial
forfeiture of such charters.

It is stated in Texas Jurisprudence, Vol. 5, p. 382:

"The legislature, deriving its authority
from the constitution, has re-enacted these
provisions, and they now appear in the Revised
Statutes. This section of the Constitution
not only confers powers upon the Attorney Gen-
eral, but it also imposes duties which must

435

be performed whenever facts arise which call for their performance.

"The duty to inquire into the charter rights of private corporations is to the end that when in his opinion it becomes necessary to take steps to prevent the abuse of corporate power, he may do so. This right exists in the very nature of the office, and could, it has been said, be exercised by the Attorney General in the absence of a constitutional provision expressly conferring it.

"The Supreme Court has expressed the belief that it was not the purpose of the constitution to confer on the Attorney General the right to maintain this type of equitable proceeding in every case in which a private corporation may exercise a power not conferred by law, without reference to the question as to whether such exercise is hurtful to some interest essentially public. Accordingly, it has been steadily held that suits of this character cannot be maintained when private rights alone are involved."

In support of the above statement, we quote from the case of State v. Farmers Loan & Trust Company, et al, (Sup. Ct. Tex.) 17 S. W. 60, as follows:

"It is not believed that it was the purpose, by the section of the constitution before referred to, to confer on the attorney general the power to institute and maintain an equitable proceeding such as this, in every case in which a private corporation may exercise a power not conferred by law, without reference to the question whether such exercise of power is hurtful to some interest essentially public; nor is it believed that it was thereby intended to confer on him the power to institute and maintain suits to prevent the exercise of a power not conferred by law on such corporations, except in cases in which it is made to appear that the exercise of the power will be hurtful to some interest essentially public. This view is

439

strengthened by the connections in the paragraph of the section of the constitution in which the general language which seems to be relied upon is found, for all these relate to matters in which the public have a direct interest. The right of the attorney general, in behalf of the State, through the courts, to prevent any private corporation from exercising any power not conferred by law, when this is hurtful to the public, or the assumption of a franchise, which in itself is a public wrong, cannot be questioned, and would exist from the nature of the office, in the absence of a constitutional provision expressly conferring it."

In view of the foregoing authorities and the facts stated in your letter, you are advised that it is our opinion that the acts of the above named hospitals engaging in the business of health insurance and the Delaware company acting as their agent as such are ultra vires acts.

Trusting that the foregoing fully answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

APPROVED DEC 2, 1947

FIRST ASSISTANT
ATTORNEY GENERAL

By *Ardell Williams*

Ardell Williams
Assistant

AW:GO


APPROVED
OPINION
COMMITTEE
BY
CHAIRMAN